UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 24-cr-344 (LLA) |
| v. : | |
| : | |
| MICHAEL KENNY : | |
| : | |
| and : | |
| : | |
| THOMAS KENNY, : | |
| : | |
| Defendants : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Michael Kenny and Thomas Kenny have each pled guilty to two second degree misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count One) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Two). For the reasons set forth herein, the government requests that this Court sentence Michael Kenny and Thomas Kenny each to 14 days' incarceration and 36 months' probation. The government also requests that this Court impose on each defendant 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

**I.      Introduction**

Defendants Michael and Thomas Kenny participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020

Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Michael Kenny and Thomas Kenny pled guilty to violations of 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). The government's recommendation is supported by the defendants' extensive path through multiple areas of the Capitol building and complete disregard for the ample signs and directives they encountered that indicated they were in a restricted grounds and building.

The Court must also consider that the defendants' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for their actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of the Kennys' crime support a sentence of 14 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution as to both defendants in this case.

II.     **Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF Nos. 36 and 37 ¶¶ 1–7.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

*Defendants Michael Kenny's and Thomas Kenny's Roles in the
January 6, 2021 Attack on the Capitol*

On January 6, 2021, brothers Michael Kenny and Thomas Kenny travelled to Washington, D.C., to attend the "Stop the Steal" rally and election-related protests. Upon their arrival in D.C., the brothers made their way to the U.S. Capitol and joined the mob assembling on the Capitol's restricted grounds. Michael Kenny wore a brown jacket and a black and yellow beanie, and Thomas Kenny wore a red jacket and a black beanie. *See* Image 1.



*Image 1* (Michael Kenny at left; Thomas Kenny at right)

By approximately 2:30 p.m., the Kennys reached the Capitol's Upper West Terrace, where they joined rioters gathering around entrances to the Capitol building near the Northwest Courtyard and the center-Upper West Terrace area—immediately behind the inaugural stage. *See* Image 2.

3


*Image 2*

The Kennys made their way to the Upper West Terrace door, which is situated at the center of the Upper West Terrace. As they approached the door, they passed knocked over barriers and the inaugural stage, which rioters had started to overrun. *See* Image 3.


*Image 3* (Thomas Kenny at left; Michael Kenny at right)

At approximately 2:35 p.m., the Kennys entered the Capitol building through the Upper West Terrace door. *See* Image 4. The Upper West Terrace door is normally an emergency exit, and an alarm was blaring as the Kennys began their path through the building. Boxes that Capitol staff had stored in the hallway leading to the door were strewn across the floor.

4



*Image 4*

Upon entry into the Capitol building, the Kennys walked up a nearby set of stairs to the Capitol's second floor. From the stairs, they moved with the mob, which included rioters wearing military-style gear, toward the Capitol Rotunda. *See* Images 5 and 6.

 

*Image 5* (Michael Kenny)      *Image 6* (Thomas Kenny)

By approximately 2:36 p.m., the Kennys entered the Rotunda from the room's north end. They joined the mob in the Rotunda for approximately 9 minutes. *See* Images 7–9. During their time in the Rotunda, the Kennys moved about the room and spoke with other rioters.

5



*Image 7*



*Image 8*



*Image 9*

The Kennys remained in the Rotunda until approximately 3:05 p.m., when Metropolitan Police Department (MPD Officers) started to gather an effort to push the rioters out of the Rotunda. *See* Image 10.



*Image 10*
(Kennys circled in red; gathering MPD officers indicated with yellow arrow)

By approximately 3:06 p.m., the Kennys moved out of the Rotunda as the officers' push began. Just before 3:07 p.m., the Kennys exited the Capitol through the East Rotunda Doors. *See* Images 11 and 12.


*Image 11*


*Image 12*

*Thomas Kenny's Interviews with the FBI*

On August 24, 2024, FBI investigators interviewed Thomas Kenny outside of his residence in Greenwich, Connecticut, which he shared with Michael Kenny. Thomas Kenny told investigators that he and his brother had been at the Capitol on January 6, 2021. He explained that they travelled by train to D.C. and reached the Capitol building by around 2:00–2:30 p.m. He claimed they saw U.S. Capitol Police officers standing around, but not indicating to leave or preventing entrance to the building. Thomas Kenny further claimed there were no other indications to not enter the Capitol.

On March 25, 2022, FBI investigators again interviewed Thomas Kenny at his residence. Thomas Kenny confirmed his and Michael Kenny's depictions in photographs from the Capitol. Thomas Kenny also voiced his displeasure with the Department of Justice and the FBI, indicating he was apprehensive to assist because he was aware of other individuals who entered the Capitol that had been arrested.

Michael Kenny did not speak with investigators.

*The Charges and Plea Agreement*

On July 29, 2024, the United States charged Michael Kenny and Thomas Kenny by a two-count Information with violating 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). On August 14, 2024, pursuant to a plea agreement, Michael Kenny and Thomas Kenny pled guilty to both Counts of the Information. By plea agreement, the defendants agreed to each pay $500 in restitution to the Architect of the Capitol.

### III.   Statutory Penalties

Michael Kenny and Thomas Kenny now face a sentencing for violating 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S.

Probation Office, the defendants face up to six months of imprisonment and a fine of up to $5,000. The defendants must also pay restitution under the terms of their plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV. Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 14 days' incarceration and 36 months' probation.

#### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing the Kennys' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like the Kennys, the absence of violent or destructive acts is not a mitigating factor. Had they engaged in such conduct, they would have faced additional criminal charges.

One of the most important factors in the Kennys' case is the breadth of both (1) the two brothers' journey through the Capitol building and (2) the signals of the illegality of their conduct that the two brothers blatantly ignored. Entering the Capitol through the Upper West Terrace door—alarms blaring and storage boxes scattered across the interior hallway—was just the start.

10

The Kennys were on two different floors of the Capitol building. They did not just walk in, realize their mistake, then leave. They stuck around as long as they could: until they realized police were mobilizing to move rioters out of the Rotunda.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. History and Characteristics

Michael and Thomas Kenny were raised in a working-class environment. PSR ¶ 34. They have good relationships with each other and the rest of their family. They both have had steady employment and no financial liabilities. *Id.* ¶ 57. With the privilege of steady upbringings and strong family relationships, nothing in the Kennys' background explains their decision to invade a secure government building and break federal law on January 6, 2021.

Neither Michael Kenny nor Thomas Kenny has a criminal history.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. This factor supports a sentence of incarceration, as it does in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

11

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to these particular defendants weighs heavily in favor of incarceration.

Although the Kennys accepted responsibility by pleading guilty, their plain disregard for the law on January 6, 2021 clashes strongly with their good upbringings and lack of criminal history. Taking advantage of the chaos created by others, the two brothers threw common sense to the wind and decided soberly to join and enhance that chaos. Their desire to join the riot—the circumstances of which are due to repeat every four years—set them on a road leading in the opposite direction of their clean histories. Thus, the Court must sentence the Kennys in a manner sufficient to deter them specifically, and others generally, from going down that road again.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[2] This Court must sentence Michael Kenny and Thomas Kenny based on their own conduct and relevant characteristics, but should give substantial weight to the context of their unlawful conduct: their participation in the January 6 riot.

Both defendants have pleaded guilty to both Counts of the Information. These offenses are Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." "Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006).

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol Siege petty offense cases

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012); *see United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Mark Nealy*, 23-cr-278 (TSC), Nealy pled guilty to violating 40 U.S.C. § 5104(e)(2)(G). Nealy entered the Capitol building shortly after the breaches on the Upper West Terrace. He walked around the interior of the Capitol building and was in the Capitol building for approximately 13 minutes—less than half the time the Kennys spent inside. Judge Chutkan sentenced Nealy to 14 days of incarceration.

In *United States v. Ruben Reyna*, 23-cr-350 (CKK), Reyna pled guilty to violating 18 U.S.C. § 1752(a)(1). Reyna, like the Kennys, approached the Capitol's west side and observed chaos unfolding around the building. Reyna, unlike the Kennys, only spent one minute inside the building, though Reyna also made statements after January 6, 2021, on social media blaming the violence on the police and downplaying his conduct. Thomas Kenny similarly downplayed his conduct to investigators—claiming he and his brother saw no indications they were not allowed to enter the building—and neither Thomas nor Michael have, like Reyna, expressed any remorse for their conduct. Judge Kollar-Kotelly ultimately sentenced Reyna to 14 days' incarceration.

In *United States v. Jean Lavin*, 21-cr-596 (BAH), Lavin pled guilty to violating 40 U.S.C. § 5104(e)(2)(G). Like the Kennys, Lavin spent approximately a half-hour inside the building. Lavin spoke with the FBI, but somewhat minimized her conduct. Both the Kennys and Lavin witnessed obvious signs of vandalism and mayhem caused by other rioters and pled guilty early in their cases' proceedings. Judge Howell sentenced Lavin to 10 days intermittent confinement as part of a 36-month term of probation.

In *United States v. Christopher Gutierrez*, 24-cr-184 (LLA), Gutierrez pled guilty to the same two class B misdemeanors as the Kennys. Like the Kennys, Gutierrez spent over a half-hour

in the building, and covered multiple areas of the building during his trespass. Both Gutierrez and the Kennys did not leave the building until later actions of law enforcement prompted them to do so. Unlike the Kennys, Gutierrez gave a detailed statement to law enforcement about his actions on January 6 and provided video footage to the FBI. This Court sentenced Gutierrez to 60 days of home detention as part of a three-year sentence of probation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

V.    **Restitution**

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

16

restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that both defendants must each pay $500 in restitution, which reflects in part the role they played in the riot on January 6.[4] As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." The Kennys' restitution payments must be made to the Clerk of the Court, who will forward the payments to the Architect of the Capitol and other victim entities.

## VI. Fine

The defendants' convictions subject them to a statutory maximum fine of $5,000 on each count. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C.

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

§ 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendants' financial assets set forth in the PSR suggest that the defendants are unable, and are unlikely to become able, to pay a fine.

### VII. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence the defendants each to 14 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on the defendants' liberty as a consequence of their behavior, while recognizing their acceptance of responsibility for their crimes.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:  */s/ Nathaniel K. Whitesel*
NATHANIEL K. WHITESEL
Assistant United States Attorney
DC Bar No. 1601102
601 D Street NW
Washington, DC 20530
nathaniel.whitesel@usdoj.gov
(202) 252-7759